IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION


RODNEY ALLEN PIERCE                                                          PLAINTIFF

VS.                                                        CIVIL ACTION NO. 3:14cv971-FKB

CAROLYN W. COLVIN, COMMISSIONER                                   DEFENDANT
OF SOCIAL SECURITY ADMINISTRATION

_____

MEMORANDUM OPINION AND ORDER

     This cause is before the Court regarding the appeal by Rodney Allen Pierce of the

Commissioner of Social Security's final decision denying Pierce's application for Supplemental

Security Income ("SSI") benefits. In rendering this Memorandum Opinion and Order, the Court

has carefully reviewed the Administrative Record [14] regarding Pierce's claims (including the

administrative decision, the medical records, and a transcript of the hearing before the

Administrative Law Judge ("ALJ")), Plaintiff's Memorandum Brief [16], and Defendant's

Motion for an Order Affirming the Commissioner's Decision [17] with supporting memorandum

[18].  The parties have consented to proceed before the undersigned United States Magistrate

Judge, and the District Judge has entered an Order of Reference [22].  28 U.S.C. § 636(c); Fed.

R. Civ. P. 73.

     For the reasons discussed in this Memorandum Opinion and Order, the Court finds that

the Commissioner's decision should be affirmed.  Accordingly, Plaintiff's appeal is denied, and

Defendant's Motion for an Order Affirming the Decision of the Commissioner [17] is hereby

granted as set forth in this Opinion.

I. PROCEDURAL HISTORY

On November 7, 2011, Pierce filed for Supplemental Security Income ("SSI") disability benefits, asserting an onset date of October 25, 2010.[1] [14] at 117.[2]   Pierce was born on September 8, 1975, and he was thirty-six years of age as of the date of his application.  *Id.* at 20. Thus, he was considered a "younger individual" pursuant to the regulations.  20 C.F.R. § 416.963.  Pierce has a high school education, and he has worked as a landscaping laborer, tire repair servicer, and assembly worker. [14] at 70, 85.  In his request for disability, Pierce alleged that he was disabled because of schizophrenia, numbness and weakness in his legs, and back pain.  *Id.* at 142.

The Social Security Administration denied Pierce's application initially and upon reconsideration. *Id.* at 89, 90. Pierce requested a hearing, which was held on July 5, 2013.  *Id.* at 64.  Subsequently, the ALJ issued a decision finding that Pierce was not disabled.  *Id.* at 10.

## II.  MEDICAL HISTORY

According to the records, Plaintiff has a history of lower back pain, including mild bulging disks at L3-L4 and L4-L5, which was confirmed by medical testing.  *Id.* at 284, 538. Dr. Azhar Pasha of Anderson South Hospital in Meridian, Mississippi, formally diagnosed him with lumbar spondylosis and degenerative disk disease of the lumbar spine.  *Id.* at 434, 438, 441, 449, 457, 465, 467, 481.  In 2011 and 2012,  Dr. Pasha treated Pierce with pain medications and performed a series of nerve blocks and radiofrequency ablations on Pierce's lumbar spine to help relieve lower back and extremity pain, with good results.  *Id.*  The record shows that Pierce continued seeking treatment from the same clinic for pain in his lower back and lower

---

[1]At the hearing, Pierce amended his onset date to October 25, 2010.  [14] at 69.

[2]Citations reflect the original pagination of the administrative record.

extremities in 2012 and 2013.  *Id.* at 567- 575. Even though he was diagnosed with opioid dependence and was counseled on taking medications in excess, *id.* at 574, the center continued him on a narcotic pain regimen resulting in "stable" pain control.  *Id.* at 571, 567-573.  He indicated that he wanted to "hold off on procedures" in March and June 2013, and, instead, pursue pain management through medications.  *Id.* at 568, 571.

The administrative record also contains several years of treatment notes regarding Pierce's mental health.  In addition, these records shed some light on his criminal record. In a May 2010 progress note, Terry T. Jordan, M.D., of Weems Community Mental Health Center ("Weems"), in Lauderdale County, Mississippi, noted that Pierce had "gotten in trouble in the past for selling drugs" and had "been jailed at Parchman because of drug charges." *Id.* at 502.

In May 2010, Pierce "adamantly" denied any suicidal or homicial ideations, compulsions, or plans.  *Id.*  Pierce also denied any auditory or visual hallucinations and paranoia.  *Id.*  Dr. Jordan diagnosed Pierce with benzodiazepine dependence, a history of multiple substance abuse (opiates, stimulants, cocaine, methamphetamine, marijuana, alcohol), a history of likely substance-induced psychotic disorder, and substance-induced mood disorder versus depressive disorder not otherwise specified.  *Id.* at 502-503.  Dr. Jordan made a diagnosis of "rule out" antisocial personality disorder and concluded that Pierce had antisocial personality disorder traits.  *Id.* at 503.  Dr. Jordan also diagnosed back pain.  *Id.*

From October 1 to 27, 2010, Pierce underwent court-ordered commitment and treatment at Alliance Health Center in Meridian, Mississippi, under the care of Dr. Jordan.  *Id.* at 289. Prior to his admission, he had been in jail one week.  *Id.*  The Discharge Summary indicates that Pierce choked his daughter and touched her inappropriately.  *Id.*  Pierce later reported that he

was on probation and that a charge of assault on a police officer was pending against him.  *Id.* at 316.  Subsequent records state that he had threatened to kill his mother.  *Id.* at 313.

Pierce also reported that, prior to his admission, he had suicidal ideations and threatened suicide, had "drugged gasoline several times," had not bathed for months, drank liquor daily, abused Xanax and Lorcet, experienced daily hallucinations, delusions, and paranoia, yet had been noncompliant with outpatient treatment and medications.  *Id.* at 289.  Upon his admission, he was irritable, displayed sadness, and was easily angered.  *Id.*  Pierce showed the doctor areas on his arms where he had cut himself.  *Id.*  Pierce reported that he heard voices in his head, telling him to do certain things, and he had delusions of special powers.  *Id.*  During his hospitalization, laboratory tests also revealed that Pierce had Hepatitis B and C.  *Id.* at 289-290.

After a nearly one month course of various therapies, including group, individual, activity, orientation and milieu, as well as pharmacotherapy, his condition and behavior had improved.  *Id.* at 290-291.  Upon admission on October 1, 2010, his GAF was 30, and upon discharge on October 27, his GAF had improved to 45+.  *Id.* at 289.  At discharge, his doctor commented that his prognosis was good, and that condition would correlate "with the patient's commitment to aftercare followup and medication compliance as well as [abstinence] from substance abuse. . . ."  *Id.* at 292.  He was to continue his course of psychotropic medications, such as trazodone for insomnia and Risperdal for psychosis.  *Id.*

After he was discharged from Alliance Health Center, Pierce was immediately committed to the East Mississippi State Hospital ("EMSH"), where a bed had become available for him.  *Id.* at 291.  During the course of treatment, he admitted to prior use of drugs, including crystal methamphetamine, marijuana, and alcohol.  *Id.* at 315.  He stated that he took Lorcet for pain in

his back.  *Id.*  However, Pierce admitted that he had abused pain medication, Lorcet 10 mg, and

that he normally took 8 or 9 tablets a day.  *Id.*  On the other hand, he reported that he had

decreased his dosage just prior to admission and claimed that he had not taken Lorcet in two

months.  *Id.*  He also reported that he had been taking Xanax daily since 2003 for anxiety.  *Id.*

During his stay at EMSH, a treatment team pursued drug therapy.  *Id.* at 318.  During the

course of his treatment, he gained privileges and showed improvement. *Id.*  When he was

discharged on November 30, 2010, his GAF had improved to 59, his condition was described as

"satisfactory," and he was able to return home to live with his mother.  *Id.* at 319-320.  Pierce

did not verbalize or display anger or anxiety, and his speech was normal with appropriate mood

and affect.  *Id.*  He denied any suicidal or homicidal ideations, he denied any auditory or visual

hallucinations, and he did not suffer from delusions or paranoia.  *Id.*  The treating nurse

practitioner described his prognosis as "guarded given his extensive history of alcohol and drug

use."  *Id.*

The record reflects that Pierce sought regular follow-up mental health care and a course

of substance abuse outpatient therapy at Weems from December 2010 to June 2013. *Id.* at 361-

377, 495-497, 591-616.  As of November 2011, his treating nurse practitioner, Susan Bobo,

commented that Pierce "continues current adaptation without major problem, difficulty or

symptoms in interim since last visit.  Good vegetative functioning on current regimen."  *Id.* at

361.  Bobo also observed that Pierce "exhibits no positive signs of psychosis or major affective

disruption, has no neuroleptic effects evident presently" with "adequate insight and alliance."

*Id.*  At that time, he was compliant with his medications and continued to follow up with Weems

for monthly injections of Invega Sustenna, which treated his schizophrenia.  *Id.* at 361, 374-375.

As to his education, he told interviewers at EMSH that he graduated high school with a "certificate, special classes." *Id.* at 316.  A nurse practitioner at EMSH estimated that he may have sub-average intelligence based upon his communicative skills and his use of vocabulary. *Id.* at 317.  His school records indicate that he made low passing marks in most classes without repeating a grade.  *Id.* at 136-137.  Instead of giving his grade point average and class rank, his "Graduation Facts" indicate that he "Completed Other Prescribed Program."  *Id.* at 137.  At the hearing, Pierce testified that he had completed twelfth grade with a certificate.  *Id.* at 70.

### III.  HEARING AND DECISION

At the hearing on July 5, 2013, the ALJ and Pierce's attorney elicited testimony from him regarding his condition.  *Id.* at 66.  He testified that his typical day consisted of rising early in the morning, occasionally helping with some household chores, and watching television throughout the day.  *Id.*  71-72.  During the hearing, Pierce reported that he had heard voices and had hallucinations of dead and living relatives.  *Id.* at 77-79.  He reported that these voices and hallucinations interfered with his concentration.  *Id.*  However, Pierce also admitted that his medications, including the Invega Sustenna shots, had helped his condition in that he did not hear the voices as much as he did prior to receiving the treatment.  *Id.* at 79.

In her September 2013 decision, the ALJ evaluated Pierce's impairments and found that he has the severe impairments of degenerative disc disease, obesity, schizophrenia, and depression.  *Id.* at 15.  However, the ALJ concluded that Pierce did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments.  *Id.* at 17.  After considering the record, the ALJ found that Pierce has the residual functional capacity to perform light work, but needs to sit or stand every 30 minutes, must have simple instructions

only, and only occasional contact with the public and coworkers. *Id.* at 18.

The ALJ determined that Pierce is unable to perform any of his past relevant work as a landscape laborer, tire repair serviceman, classified as heavy, semi-skilled work; or assembly worker, classified as light, unskilled work. *Id.* at 20. The ALJ observed that Pierce has at least a high school education and is able to communicate in English. *Id.* Using the Medical-Vocational Rules as a framework, the ALJ concluded that Pierce is not disabled, whether or not he has transferable job skills. *Id.* Considering Pierce's age, education, work experience, and residual functional capacity, the ALJ concluded that jobs exist in significant numbers in the national economy that Pierce can perform. *Id.* A vocational expert identified the representative occupations as gate guard/gate tender, counter rental clerk at storage facility, and mail clerk/sorter. *Id.* at 21. The vocational expert found that the available positions for gate guard/gate tender were eroded by ten percent because of occasional contact with the public, coworkers, and supervisors. *Id.* The vocational expert determined that the available jobs for counter rental clerk at a storage facility were eroded by twenty-five percent due to contact with others. *Id.* The vocational expert also concluded that the mail clerk/sorter positions were eroded by ten percent for the requirement of changing positions every 30 minutes. Thus, the ALJ determined that Pierce has not been under a disability since November 7, 2011, the date the application was filed, through the date of the September 16, 2013, decision. *Id.*

The Appeals Council denied Pierce's request for review. *Id.* at 1. Thereafter, Plaintiff filed this action. The matter has been briefed and is now ripe for review.

## IV. STANDARD OF REVIEW

This Court's review is limited to an inquiry into whether there is substantial evidence to

support the Commissioner's findings, *Richardson v. Perales*, 402 U.S. 389, 390, 401 (1971), and

whether the correct legal standards were applied, 42 U.S.C. § 405(g) (2006). *Accord Falco v.*

*Shalala*, 27 F.3d 160, 163 (5th Cir. 1994); *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990).

The Fifth Circuit has defined the "substantial evidence" standard as follows:

> Substantial evidence means more than a scintilla, less than a preponderance, and
> is such relevant evidence as a reasonable mind might accept as adequate to
> support a conclusion. It must do more than create a suspicion of the existence of
> the fact to be established, but "no substantial evidence" will be found only where
> there is a "conspicuous absence of credible choices" or "no contrary medical
> evidence."

*Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983). In applying the substantial evidence

standard, the Court must carefully examine the entire record, but must refrain from re-weighing

the evidence or substituting its judgment for that of the Commissioner. *Ripley v. Chater*, 67 F.3d

552, 555 (5th Cir. 1995). Conflicts in the evidence and credibility assessments are for the

Commissioner and not for the courts to resolve. *Martinez v. Chater*, 64 F.3d 172, 174 (5th Cir.

1995). Hence, if the Commissioner's decision is supported by the evidence, and the proper legal

standards were applied, the decision is conclusive and must be upheld by this Court. *Paul v.*

*Shalala*, 29 F.3d 208, 210 (5th Cir. 1994), *overruled on other grounds, Sims v. Apfel,* 530 U.S.

103 (2000).

## V. DISCUSSION OF THE ALLEGED ERRORS
## AND APPLICABLE LAW

Plaintiff argues that the ALJ's decision should be reversed for the following reasons:

1.      The ALJ erred in her formulation of the Plaintiff's RFC.

2.      The ALJ erred in her findings concerning the *Dictionary of Occupational
        Titles*.

3.      The ALJ created her RFC based upon no medical opinion whatsoever.

-8-

4.    The ALJ erred in her weight given to the opinions of nurse practitioners under SSR 06-3P.

5.    The ALJ erred in her assessment of the Plaintiff's education.

[16] at 1-18.

### A.  Did the ALJ err in her formulation of Plaintiff's RFC?

Pierce argues that the ALJ erred when she found an RFC that allows him to perform light work, with the option to sit or stand every thirty minutes, with simple instructions only, and only occasional contact with the public and co-workers.  More specifically, Pierce argues that the RFC did not adequately account for his severe impairment of schizophrenia when the ALJ stated that Pierce could have "occasional"  contact with the public and co-workers.  Furthermore, Plaintiff argues that he "possibly" meets Listing 12.03.

"[T]he ALJ has the sole responsibility for determining the claimant's disability status." *Moore v. Sullivan*, 919 F.2d 901, 905 (5th Cir. 1990).  Although the record contains evidence supporting Plaintiff's argument, substantial evidence in the record supports the ALJ's decision.

In his brief, Pierce argues that the RFC of "occasional contact with the public and coworkers" did not sufficiently account for his severe impairment of schizophrenia. [16] at 7-9. Plaintiff quotes his hearing testimony that he has hallucinations and problems focusing. *Id*. Without citation to the record, he also asserts that a treating nurse practitioner, Susan Bobo, "showed the presence of delusions or hallucinations" and "illogical thinking or looseness of associations with blunt, flat or inappropriate affect" and that she found that he had "marked difficulties maintaining social functioning" and "four or more episodes of decompensation," which would meet Listing 12.03 (A) and (B).

Listing 12.03 states, as follows:

Schizophrenic, Paranoid, and Other Psychotic Disorders: Characterized by the onset of psychotic features with deterioration from a previous level of functioning.

The required level of severity for these disorders is met when the requirements in both A and B are satisfied, . . . .

A.  Medically documented persistence, either continuous or intermittent, of one or more of the following:

      1.  Delusions or hallucinations; or
      2.  Catatonic or other grossly disorganized behavior; or
      3.  Incoherence, loosening of associations, illogical thinking, or poverty of content of speech if associated with one of the following:
            a.  Blunt affect; or
            b.  Flat affect; or
            c.  Inappropriate affect; or
      4.  Emotional withdrawal and/or isolation;

AND

B.  Resulting in at least two of the following:

      1.  Marked restriction of activities of daily living; or
      2.  Marked difficulties in maintaining social functioning; or
      3.  Marked difficulties in maintaining concentration, persistence, or pace; or
      4.  Repeated episodes of decompensation, each of extended duration; . . . .

Listing 12.03 (A) and (B), 20 C.F.R. Ch. III, Pt. 404, Subpt. P, App. 1 (2016).

In September 2011, Nurse Practitioner Bobo at Weems completed a Mental Impairment Questionnaire regarding Pierce. [14] at 354-359. Therein, she opined that Pierce had no restrictions of daily living activities, marked difficulties in maintaining social functioning, moderate deficiencies maintaining concentration, persistence or pace, and four or more episodes of decompensation, each of extended duration.[3] *Id*. at 355-356.

_____

[3]  Although Nurse Practitioner Bobo noted that Pierce experienced four or more episodes, she gave no dates to support this assessment. Pierce also fails to support his argument with

Pierce points to the presence of delusions and hallucinations and illogical thinking or looseness of associations with blunt, flat or inappropriate affect shown in Bobo's records and contends that he meets paragraph A, subparts 1 and 3, of Listing 12.03. [16] at 9. Pierce also refers to Bobo's opinions that he has marked difficulties in maintaining social functioning and four or more episodes of decompensation, each of extended duration, and contends that he meets paragraph A, subparts 2 and 4, of Listing 12.03.

In order to meet Listing 12.03, Pierce must show that he met the requirements of both paragraphs A <u>and</u> B.[4] Although the ALJ did not discuss paragraph A in her decision, she considered paragraph B and found that Pierce did not meet the paragraph B criteria of the Listing. [14] at 17. Specifically, the ALJ found that Pierce had only moderate difficulties in social functioning and no episodes of decompensation of extended duration. The ALJ concluded that "[b]ecause the claimant's mental impairments do not cause at least two 'marked' limitations or one 'marked' limitation and 'repeated' episodes of decompensation, each of extended duration, the 'paragraph B' criteria are not satisfied." *Id*.

The ALJ acknowledged and addressed Bobo's September 2011 Mental Impairment Questionnaire. *Id*. at 19-20. In fact, she also acknowledged that another nurse practitioner at Weems, Noel Palmer, updated Bobo's report on June 27, 2013, indicating no change in Pierce's difficulty maintaining social functioning. *Id*. at 20. The ALJ found, however, that the Weems

___

citation to any specific dates of decompensation.

[4] A claimant may also meet Listing 12.03 by satisfying the requirements of paragraph C. The ALJ found that Pierce did not meet the requirements of paragraph C, [14] at 17, and Pierce does not assert in his brief that he met the requirements of paragraph C.

"office records are inconsistent" with these opinions.[5] *Id.* As the ALJ noted,

> At his most recent documented visit with Mr. Palmer, the claimant appeared reality based and future oriented with no positive signs of psychosis or major affective disruption. His memory and concentration were grossly intact, his insight fair, and his reliability good. Mr. Palmer assigned a GAF of 52, indicating moderate symptoms.

*Id.*; *see Id.* at 593.

The ALJ also noted that two medical consultants, David Powers, Ph.D. and Gregg Johns, Ph.D., both found that Pierce had only moderate mental limitations. *Id.* at 19. In a September 28, 2011, Mental Residual Functional Capacity Assessment, Dr. Powers found that Pierce was only moderately limited in social interaction. *Id.* at 348-350. In another such assessment on December 19, 2011, Dr. Johns found Pierce either not significantly limited or only moderately limited in all areas of social interaction. *Id.* at 419-421. Dr. Johns concluded,

> When complying with prescribed meds and maintaining sobriety, claimant can understand and remember simple instructions and carry out these tasks. He can concentrate and attend for 2-hour periods, interact with supervisors and coworkers at a very basic level, and adapt adequately in order to complete a normal work week without excessive interruption from psychologically based symptoms.

*Id.* at 421.

Jan P. Boggs, Ph.D. conducted a comprehensive mental status examination on January 12, 2011. *Id.* at 329. Having examined Pierce and reviewed his records, Dr. Boggs stated that he "did not observe any psychosis" and concluded that Pierce is "capable of following directions and of sustaining task as long as he stays clear of drug and alcohol abuse" and is "capable of

---

[5] The ALJ also stated that these nurse practitioners' opinions were given "some consideration" in her decision, but were "not given the weight of treating source opinions." [14] at 20. The weight given to these nurse practitioners' opinions is addressed separately below.

relating appropriately to others." *Id*. at 332.

The primary issue is whether substantial evidence supports the ALJ's conclusion that Pierce has moderate difficulties in social functioning, rather than marked, as required to meet paragraph B of Listing 12.03. While there is conflicting evidence regarding the severity of Pierce's social functioning, it is not the role of this Court to re-weigh the evidence, try the case *de novo,* or substitute its judgment for that of the ALJ. *See Newton v. Apfel,* 209 F.3d 448, 452 (5th Cir. 2000). "Conflicts in the evidence are for the [Commissioner] and not the courts to resolve." *Brown v. Apfel*, 192 F.3d 492, 496 (5th Cir. 1999)(quoting *Selders v. Sullivan,* 914 F.2d 614, 617 (5th Cir.1990)).

The Court finds that substantial evidence supports the ALJ's finding that Pierce did not have the requisite deficits in social functioning to meet Listing 12.03(B)(2). The ALJ considered the evidence urged by Pierce, specifically, his hearing testimony and Bobo's opinion that Pierce had marked difficulties in maintaining social functioning. *See* [14] at 17-20. But the record in this case contains other evidence that "a reasonable mind might accept as adequate to support [the ALJ's] conclusion" of moderate difficulties in maintaining social functioning. *Hames*, 707 F.2d at 164. Accordingly, substantial evidence supports the ALJ's formulation of the RFC and conclusion that Pierce does not meet Listing 12.03, and this assignment of error is without merit.

B. Did the ALJ err in her findings concerning the *Dictionary of Occupational Titles*?

Pierce argues that the ALJ erred when she relied on testimony from the vocational expert that was not consistent with the *Dictionary of Occupational Titles*.  Based on the vocational expert's testimony, the ALJ identified three jobs that Pierce could perform:  gate guard/gate tender, counter rental clerk at a storage facility, and mail clerk/sorter.  Plaintiff argues that the

descriptions of these jobs, as found in the *Dictionary of Occupational Titles*, are beyond

Plaintiff's capabilities, based on the RFC as determined by the ALJ.  More specifically, Pierce

argues that the gate guard/gate tender job and the counter rental clerk job require "significant"

work with people, which is beyond the RFC's limitation of "only occasional contact with the

public and coworkers."  Pierce further asserts that while the mail clerk/sorter job does not

require significant contact with people, its requirement of "attaining precise set limits, tolerances

and standards" is beyond the RFC's description finding that Pierce can perform a job that "must

have simple instructions only." [14] at 18.

The Fifth Circuit has addressed perceived conflict between a vocational expert and the

*Dictionary of Occupational Titles*, stating:

> claimants should not be permitted to scan the record for implied or unexplained
> conflicts between the specific testimony of an expert witness and the voluminous
> provisions of the [*Dictionary of Occupational Titles*], and then present that
> conflict as reversible error, when the conflict was not deemed sufficient to merit
> adversarial development in the administrative hearing.

*Carey v. Apfel*, 230 F.3d 131, 146-47 (5th Cir. 2000). "Moreover, as the Fifth Circuit observed in

*Carey*, the *Dictionary of Occupational Titles* job descriptions are not comprehensive and should

not be given a role that is exclusive of the Vocational Expert's testimony as to whether a

particular claimant can perform a particular job." *Abel v. Astrue*, 2011 WL 1099890 at *7 (S.D.

Miss. Mar. 2, 2011).

In this case, the vocational expert took into consideration the need for "only occasional

contact with the public or coworkers," [14] at 86, when she decreased the number of jobs

available by a certain percentage based on that limitation.  Although Pierce's counsel presented

the vocational expert with his own hypothetical based on his interpretation of Pierce's

restrictions, he did not cross-examine the vocational expert about any purported conflict between the ALJ's hypothetical, the vocational expert's response, and the *Dictionary of Occupational Titles*. In short, the vocational expert's testimony was not challenged or contradicted in any manner. The Court, therefore, concludes that the record reflects an adequate basis for the ALJ's reliance on the vocational expert's testimony on this issue.

Moreover, the mail clerk/sorter, with its specific vocational preparation ("SVP") of 2 and its reasoning ability level of R3, *id.* at 228, is consistent with the residual functional capacity determination that Pierce can perform a job with "simple instructions only." Courts have held that jobs with a reasoning level of 3 are consistent with an RFC limited to simple work. *See, e.g., Hurtado v. Comm'r of Soc. Sec.*, 425 Fed. Appx. 793, 795 (11th Cir. 2011)(finding "no apparent conflict" between reasoning level 2 and 3 jobs and RFC limited to "simple, routine tasks"); *Terry v. Astrue*, 580 F.3d 471, 478 (7th Cir. 2009)(finding no conflict between job requiring level 3 reasoning and RFC limited to simple work); *Auger v. Astrue*, 792 F. Supp. 2d 92, 97 (D. Mass. 2011)(citing numerous cases, court stated that it was "join[ing] the great weight of authority on this issue" and held that no conflict existed between job with reasoning level of 3 and RFC limited to simple work). In fact, this Court has held that there is no "obvious, direct conflict" between "the ability to perform only simple, repetitive tasks . . . [and] Level 3 reasoning." *Abel*, 2011 WL 1099890 at *7. Accordingly, this argument does not provide a basis for relief, the ALJ's decision on this issue is not contrary to law, and it is supported by substantial evidence.

### C. Did the ALJ create her RFC based upon no medical opinion whatsoever?

The ALJ found that Pierce has the RFC "to perform light work as defined in 20 CFR 416.967(b) but needs to sit or stand every 30 minutes, must have simple instructions only and

only occasional contact with the public and coworkers." [14] at 18. Pierce argues that no underlying medical opinion supports the RFC.  Pierce is incorrect.

In her opinion, the ALJ stated that she gave consideration to the opinion of Robert Culpepper, M.D., a physician who evaluated Pierce's medical records for the Office of Disability Determination Services ("DDS").  [14] at 19.  Based on Pierce's medical records, Dr. Culpepper completed a Physical Residual Functional Capacity Assessment on January 3, 2012, providing a medical opinion on Pierce's physical and exertional limitations.  *Id.* at 423-430.  Dr. Culpepper's opinion supported a finding that Pierce was capable of light work with occasional postural activities, as defined in 20 C.F.R. § 416.967(b).  *See id.*  Accordingly, the RFC found by the ALJ is supported by a medical opinion.

Pierce also argues that the ALJ should have ordered a consultative examination.  Under the applicable regulations, if sufficient medical or other evidence is not provided by the claimant, the secretary is required to make a decision based on the information available.  See 20 C.F.R. § 404.1516 (2016).  In some cases, however, a consultative examination is required to develop a full and fair record.  20 C.F.R. § 404.1517(2016).

Nevertheless, the ALJ has the discretion to determine if such an examination is required. The Fifth Circuit has stated "[t]o be very clear, 'full inquiry' does not require a consultative examination at government expense unless the record establishes that such an examination is *necessary* to enable the administrative law judge to make the disability decision."  *Turner v. Califano*, 563 F.2d 669, 671 (5th Cir. 1977)(emphasis in original); *see also Jones v. Bowen*, 829 F.2d 524, 526 (5th Cir. 1987). While an "administrative law judge has a duty to fully and fairly develop the facts relative to a claim for disability benefits," reversal is not warranted for an

-16-

ALJ's failure to fully and fairly develop the record "unless the claimant shows that he or she was prejudiced by the ALJ's failure." *Carey v. Apfel*, 230 F.3d 131, 142 (5th Cir. 2000).  Prejudice may be established by showing that additional evidence would have been produced if the ALJ had fully developed the record, and that the additional evidence might have led to a different decision. *See Kane v. Heckler*, 731 F.2d 1216, 1220 (5th Cir. 1984).

In this case, the undersigned finds that there was sufficient medical evidence in the record on which the ALJ could base her RFC determination, thus the ALJ did not err by not ordering a consultative examination.  Moreover, Pierce has not shown any additional evidence that would have been produced if the ALJ had ordered a consultative examination or that any such additional evidence might have led to a different decision.  Accordingly, this issue has no merit.

### D.  Did the ALJ err in the weight she gave to the opinions of the nurse practitioners under SSR 06-3P?

Plaintiff argues that the Commissioner failed to follow Social Security Ruling 06-3P and give due consideration to medical evidence when she gave only "some consideration" to the opinions of Nurse Practitioners Bobo and Palmer.  Bobo provided her opinions in a "Mental Impairment Questionnaire," and Palmer completed an "Updated Mental Opinion." [14] at 354, 586.  Specifically, the ALJ stated that "[s]ome consideration is given to these opinions but they are not given the weight of treating source opinions."  *Id.* at 20.  The ALJ went on to explain that the "office records are inconsistent" with these opinions.  *Id.*

Acceptable medical sources, as found in 20 C.F.R. §§ 404.1513 and 416.913(a), include licensed physicians or osteopathic doctors, licensed or certified psychologists, licensed

optometrists (for visual disorders), licensed podiatrists (for foot and ankle impairments only), and qualified speech pathologists (for speech and language impairments only).  Thus, the regulations clearly outline what qualifies as an acceptable medical source, and a nurse practitioner is not among those listed. 20 C.F.R. § 416.913(a).  Although a nurse practitioner falls under the category of "other sources" in § 416.913(d), the ALJ is not obligated to consider evidence offered by those sources.

Under Social Security Ruling 06-3P, the ALJ may employ several factors or principles to consider the opinions of not "acceptable medical sources" as well as those from "other sources," such as nurse practitioners.  The factors include,

1.  How long the source has known and how frequently the source has seen the individual;

2.  How consistent the opinion is with other evidence;

3.  The degree to which the source presents relevant evidence to support an opinion;

4.  How well the source explains the opinion;

5.  Whether the source has a specialty or area of expertise related to the individual's impairment(s); and

6.  Any other factors that tend to support or refute the opinion.

SSR 06-3p, 2006 WL 2263437 (Aug. 6, 2006).

In this case, the ALJ considered the nurse practitioners' opinions and noted that they conflicted with their office records.  A review of the opinions of Bobo and Palmer demonstrates that they are somewhat inconsistent with their observations of Pierce during the majority of his appointments with them.  On the whole, their notes describe a person who is complying with

-18-

treatment and making strides toward better mental health.  On the other hand, their opinions

describe a patient who suffers from a panoply of ailments with little to no hope for an improved

mental health existence.  For instance, on September 29, 2011, the same date of her Mental

Impairment Questionnaire, Bobo's treatment notes relate that "patient exhibits no positive signs

of psychosis or major affective disruption, has no neuroleptic effects evident presently. Adequate

insight and alliance.  He continues to struggle with anxiety c/o but is denying return of

psychosis." [14] at 363.  Although Bobo mentioned that Pierce had anxiety in her treatment

notes, she never commented that he suffered panic attacks with the frequency as described in the

medical source statement.  In February 2012, Bobo noted that the "patient reports [that he]

presently continues current adaptation without major problem, difficulty or symptoms in interim

since last visit.  Good vegetative functioning on current regimen."  *Id.* at 495.  She also

commented that his attitude was cooperative, he answered appropriately and volunteered some

conversation, and his thought process was coherent.  *Id.*  Although Pierce requested Xanax for

anxiety, Bobo did not prescribe it, and Pierce declined a prescription for another anxiety

medicine, Atarax.  *Id.* at 496.  Bobo discussed with him that his anxiety could be a side effect of

diet pills that he was taking.  *Id.* Bobo also noted that he was not taking his antidepressant

medication. *Id.*

Likewise, the opinions of Bobo and Palmer are inconsistent with the opinions of Dr.

Powers, Dr. Johns, and Dr. Boggs, the consultative examiner who evaluated Pierce on January

12, 2011, less than two months after Pierce's release from EMSH.  *Id.* at 328.  Having reviewed

the records of treatment from Weems and Pierce's records from his hospitalization in October

and November 2010, Boggs was informed of Pierce's mental health status.  Even so, after

examining Pierce, Dr. Boggs concluded that Pierce was "capable of following directions and sustaining task as long as he stay[ed] clear of drug and alcohol abuse" and "capable of relating appropriately to others" and that Pierce's "adaptation largely depend[ed] on his abstinence from drugs and alcohol." *Id.* at 332.

In this case, the ALJ weighed the medical evidence and determined that the opinions from Bobo and Palmer were inconsistent with their office records.  The ALJ is "'entitled to determine the credibility of medical experts . . . and weigh their opinions accordingly.'" *Greenspan v. Shalala*, 38 F.3d 232, 237 (5th Cir. 1994)(quoting *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985)).  Although the ALJ did not go into great detail in describing her reasons for giving only "some consideration" to the nurse practitioners' opinions, great detail was not required, either by regulation or SSR-06p.  "Neither the regulation nor interpretive case law requires that an ALJ specifically name, enumerate, and discuss each factor in outline or other rigid, mechanical form." *Wiltz v. Commissioner*, 412 F. Supp. 2d 601, 608 (E. D. Tex. 2005). Instead, "mindful of a general duty of deference to the Commissioner's decisions, reviewing courts should examine the substance of an ALJ's decision, rather than its form." *Id.*

The record shows that there is medical evidence in the record that "a reasonable mind might accept as adequate to support the [ALJ's] conclusion" on the appropriate weight to be afforded the opinions of the nurse practitioners.  Further, the ALJ did not violate the applicable legal standard with respect to the appropriate weight to be afforded their opinions.  Accordingly, this issue provides no basis for reversal.

### E.  Did the ALJ err in her assessment of the Plaintiff's education?

Pierce argues that the ALJ erred when she concluded that he "has at least a high school

education and is able to communicate in English," citing 20 C.F.R. § 416.964. [14] at 20.

Although there is no question of Pierce's ability to communicate in English, he does dispute that

he has a "high school education."  Specifically, he asserts that he finished the twelfth grade with

"a special education certificate."  [16] at 18.   Thus, he argues that his level of education should

have been listed as not more than "marginal" or "limited."  *Id.* at 19.  Furthermore, he reasons

that the jobs identified by the vocational expert are beyond his educational capabilities because

the hypothetical posed to the vocational expert was based on a person with a high school

education.

The record, however, belies Pierce's contentions.  Contrary to Pierce's arguments, he did

not testify that he finished with a "special education certificate."  Instead,  Pierce testified at the

hearing that he finished twelfth grade "with a certificate," and he presented no more evidence on

this issue.  *Id.* at 70.  Moreover, at the hearing, the ALJ had the opportunity to evaluate his

educational level by observing his behavior and interacting with him.  In addition, the ALJ had at

her disposal Pierce's education records, treatment records, and applications for benefits to aid

her in reaching her decision.  All of these records create a more complete picture of his

educational background than that now asserted by him.  These records also support the ALJ's

conclusion that he has the educational level sufficient to perform the jobs identified by the

vocational expert.

Under the heading "Graduation Facts," his school records reflect that he finished the

twelfth grade by completing an "Other Prescribed Program," but do not indicate that Pierce had

been enrolled in special education classes.  *Id.* at 137.  In fact, there is no mention of special

education courses in his transcript.  *Id.*   While he never repeated a grade on the elementary

level, he repeated only a total of four classes throughout junior high and high school to obtain passing grades. *Id.* at 136-137.  During his high school years, he took the standard courses of English, mathematics, science, and social studies.  *Id.*  In addition, beginning his sophomore year, he enrolled in vocational courses, which counted as two and one-half credits each year, rather than the one credit each year for each of his standard courses. *Id.*  The Court also observes that Pierce achieved A's, B's, and C's in his vocational courses.  *Id.*

Other records also support the ALJ's conclusion that he had a high school education.  In his application for benefits, Pierce himself stated that he had completed twelfth grade, and he specifically denied that he had attended special education classes. [14] at 143.  Nurse Practitioners Bobo and Palmer, furthermore, consistently noted that he had average intelligence. *Id.* at 361, 363, 365, 495, 497, 591, 593, 595, 597, 599, 601, 603, 605, 607, 611, 613.  At his initial intake interview at Weems on December 7, 2010, he stated that the highest level of education he attained was twelfth grade, and, once again, he specifically denied taking special education courses.  *Id.* at 376.  During another evaluation at Weems on December 16, 2010, he reported that he had finished twelfth grade.  *Id.* at 374.  Pierce's November 2010 discharge summary from EMSH observed that he did not suffer from retardation, *id.* at 314, but he reported that he "graduated with a certificate, special classes."  *Id.* at 316.

While there is some contradictory information regarding his educational level, this does not undermine the ALJ's determination that Pierce is also a high school graduate.  Pierce's school records unequivocally demonstrate that he took regular courses with vocational training, not special education courses, as he now argues.  Even so, courts have upheld decisions where plaintiffs disputed that they had obtained a "high school education" after they achieved a high

school education through a special certificate or special education classes.  *See Perez v. Barnhart*, 415 F.3d 457 (5th Cir. 2005); *Johnson v. Barnhart,* 312 F. Supp. 2d 415, 428 (W.D. NY. 2003).

Moreover, Pierce fails to present any evidence of the impact his education level would have on his ability to perform the jobs identified by the vocational expert.  More importantly, "[t]he regulations command a finding of not disabled for illiterate or marginally educated claimants whose RFC still permits them to do light or sedentary work."  *Perez*, 415 F.3d at 464 n.6; *see also Hatcher v. Apfel*, 167 F. Supp. 2d 1231, 1238 (D. Kan. 2001).  In this case, all of the jobs identified by the vocational expert were classified as light and unskilled.  Accordingly, even if Pierce had a marginal or limited education, he would still be considered as not disabled under the regulations.  *See* 20 C.F.R. Ch. III, Pt. 404, Subpt. P, App. 2, §§ 201.23, 201.24, 202.16, 202.17.  Accordingly, there is substantial evidence to support the ALJ's conclusion that Pierce is not disabled.

<u>VI. CONCLUSION</u>

For the reasons discussed in this Memorandum Opinion and Order, the Court finds that Defendant's Motion for an Order Affirming the Decision of the Commissioner [17] should be granted, and Plaintiff's appeal should be denied.  Accordingly, the Commissioner's decision is hereby upheld, and this matter will be dismissed with prejudice.

Pursuant to Rule 58 of the Federal Rules of Civil Procedure, a separate judgment will be entered.

SO ORDERED, this the 28th day of September, 2016.

 /s/ F. Keith Ball                                    
UNITED STATES MAGISTRATE JUDGE